**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically at the time and date indicated, which may be materially different from its entry on the record.**



**Russ Kendig
United States Bankruptcy Judge**

**Dated: 03:43 PM January 15, 2016**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| SII LIQUIDATION COMPANY, | ) | CASE NO. 10-60702 |
| | ) | |
| Debtors. | ) | ADV. NO. 12-6022 |
| _____ | ) | |
| JOHN B. PIDCOCK, AS | ) | JUDGE RUSS KENDIG |
| CREDITOR TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OF DECISION** |
| | ) | **(NOT INTENDED FOR** |
| JERRY A. SCHWAB, et al., | ) | **PUBLICATION)** |
| | ) | |
| Defendants. | ) | |

On March 24, 2015, Defendant David A. Schwab filed a motion for summary judgment. Defendants Jerry A. Schwab and Donna L. Schwab also filed summary judgment motions and joined David Schwab's motion. Plaintiff filed a consolidated response in opposition, to which Defendants replied. Following submission of Plaintiff's sur-reply, the court took the matter under advisement.

The court's jurisdiction of this adversary is premised in 28 U.S.C. § 1334 and United States District Court for the Northern District of Ohio's general order of reference, Order 2012-7, dated April 4, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), (H), and (O).

1

Venue is appropriate pursuant to 28 U.S.C. § 1409.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## BACKGROUND

Plaintiff John B. Pidcock[1] is the Creditor Trustee of the Creditors' Trust created under the Debtors' confirmed chapter 11 liquidation plan ("Plan"). Debtors are Schwab Industries, Inc. and its affiliates[2] ("Schwab Industries" or "Debtors"), known as SII Liquidation Co. post-liquidation. This proceeding is Creditor Trustee's breach of fiduciary duty action against the directors and shareholders of Debtors for alleged malfeasance in the presale bankruptcy case. Defendants are Jerry Schwab, the father; Donna Schwab, his wife, and David Schwab, his son.[3]

Schwab Industries was a family owned concrete business headquartered in Dover, Ohio and also operating in Florida. Its facilities included ready-mix plants in both Ohio and Florida, an Ohio block plant, and an Ohio distribution terminal. Its assets also included a deep water port in the Gulf of Mexico and an orange grove[4] with potential limestone mining opportunity. Limestone is the primary ingredient of cement. Jerry Schwab was the majority owner of Schwab Industries, with forty-five percent (45%) of the shares. Donna Schwab held a 6.7% interest, David Schwab held 27.6%, and Mary Lynn Schwab held 20.7%. The four members of the Schwab family also held board seats and were directors of Schwab Industries. David was President of the corporation.

As a result of the economic downturn in the late 2000s, Debtors' sales declined and, coupled with the inability to obtain additional financing, led to a bankruptcy filing on February 28, 2010. Debtors were unable to secure postpetition financing to permit reorganization. When the secured lenders allowed only limited use of cash collateral, Debtors were forced into a quick liquidation of their assets via a bankruptcy auction procedure. Cement Resources, LLC[5] was the stalking horse bidder. Debtors' assets were sold to two purchasers: Oldcastle Materials, Inc. ("Oldcastle"), which bought the concrete business, and Resource Land Holdings, LLC, which purchased the orange grove.

Plaintiff's claims in this case primarily concern Defendants' actions during the sale process. He claims that Defendants were engaged in demanding and negotiating side agreements which resulted in elevating their personal interests over Debtors' and creditors'

---

[1] Plaintiff previously served as a financial advisor to the Official Committee of Unsecured Creditors ("Committee") during the chapter 11 case. (Order Gr. App. to Employ Conway MacKenzie, Inc., Main Case ECF No. 302)
[2] Medina Cartage Co., Medina Supply Company, Quality Block & Supply, Inc., O.I.S. Tire, Inc., Twin Cities Concrete Company, Schwab Ready-Mix, Inc., Schwab Materials, Inc. and Eastern Cement Corp.
[3] Dismissed defendant Mary Lynn Hites aka Mary Lynn Schwab is the daughter of Jerry and Donna and sister of David.
[4] Also known as "Corkscrew."
[5] Cement Resources was a partnership between Atlas Holdings, LLC and GarMark Partners II, LP and may also be referred to as "Atlas."

2

interests, resulting in a diminution in the sale value of the business that harmed the estate.

## **DISCUSSION**

Defendants moved the court for summary judgment, primarily challenging Plaintiff's claims based on res judicata. Federal Rule of Civil Procedure 56, adopted into bankruptcy practice by Federal Rule of Bankruptcy Procedure 7056, governs motions for summary judgment. The court is instructed to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(a). The moving party initially must prove that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If that burden is met, the burden then shifts to the non-moving party to demonstrate that factual issues do exist, thereby requiring trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). All reasonable inferences from the facts are taken in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Against this backdrop, the court sets forth the following facts.

### I. Facts

There is no dispute that Defendants acted behind the scenes to extract personal financial benefits through the sale. Although the specific terms were not fully disclosed to the court prior to the sale, various constituencies in the case were aware that self-dealing was afoot. For example, unsigned minutes from an April 30, 2010 board meeting state that "Mr. Oscar [Debtors' counsel] also advised the Board that he had informed counsel for each of the Bank Group and the Committee that the Schwab family was having discussions with Atlas/Garmark concerning additional arrangements between them if the transaction were to be consummated." (Pl.'s Ex. 2, p. 4, ECF No. 246-1) In an April 30, 2010 email, Attorney Hammer, counsel for the Committee, references the negotiations. (Defs.' Ex. HHH, ECF No. 222-12) In a May 6, 2010 email, Plaintiff specifically asked the chief restructuring officer, Larry Goddard,[6] about those negotiations. (Pl.'s Ex. 40, ECF No. 246-3) The response, which came from Ken Hirsch of Western Reserve,[7] stated that there had been "discussions regarding an ongoing management role and potential equity participation in the company." (Id.)

The negotiations were also referenced in the revised bid procedures motion. (M. Rev. Bidding Proc. Order, Main Case ECF Nos. 344 and 346) In footnote five of the bid procedure motion, Debtors disclosed that

> [V]arious of the potential purchasers, including Cement Resources [the stalking horse bidder], had discussions with the Schwab family regarding their going-forward role with the business operations of

---

6 The Parkland Group, Inc. ("Parkland") and Laurence V. Goddard provided restructuring services in the chapter 11 case. (Order Gr. App. to Employ, Main Case ECF No. 207)
7 Western Reserve Partners, LLC ("Western Reserve") served as Debtors' investment bankers during the Chapter 11 case. (Order Gr. App. to Employ, Main Case ECF No. 251)

3

> the Debtors . . . Cement Resources entered into discussions with
> certain members of the Schwab family and the Debtors' current
> management about the possibility of retaining some of (sic) all of
> them to serve as management for the businesses after the closing
> of the sale, in light of the history and experience of the current
> management team.  Cement Resources has also had discussions
> with the Schwab family regarding the potential participation of a
> minority share of the equity of Cement Resources in exchange for
> certain consideration, including vehicles and other physical assets
> owned by the shareholders that are used in the Debtors' business
> operations.  No final arrangement, however, has been reached . . . .

(M. for a Rev. Bidding Proc. Order p. 10, fn. 5, Main Case ECF No. 344)  The proposed deal was quite lucrative for Defendants: in exchange for a $3 million contribution, Defendants would receive a fifteen percent (15%) equity stake in Cement Resources; David Schwab received a four-year employment offer valued at $1.2 million; and Jerry and Donna were to receive $150,000 in consulting fees for a period of three years.[8]  (Plaintiff's Ex. 67, ECF No. 264-4)

The potential impact of these negotiations was not lost on other parties.  The Official Committee of Unsecured Creditors ("Committee") objected to the bid procedures motion and appointment of Cement Resources as stalking horse bidder, querying

> [W]hy are the Debtors moving forward with the Cement
> Resources' bid—and the harmful Bid Procedures modifica-
> tions that accompany it?  It may be related to Cement
> Resources' negotiations with the Schwab family with
> respect to a transaction that will allow the Schwabs to
> continue managing the business post-sale, and may
> further allow them to receive a minority share of Cement
> Resources' equity post-closing (the "*Schwab Considera-
> tion*") . . . . Interference by the Debtors with a competi-
> tive bidding process has manifested itself in other ways.

(Obj. of Off. Comm. of Unsecured Creds., Main Case ECF No. 378) (emphasis original)  There are logical suggestions that the side agreement caused the Schwabs to vote in favor of Cement Resources as the stalking horse bidder in spite of a bid from Oldcastle that was valued at $5.5 million greater than the Cement Resources bid.[9]  (Pl.'s Ex. 7, ECF No. 246-1)  Additionally, Plaintiff alleges that Defendants' side agreements also caused Defendants to offer special

---

[8] This deal was apparently not enough for Donna Schwab.  (Def.'s Ex. EEE, ECF No. 222-12)

[9] The Oldcastle bid was not without issues:  Oldcastle's initial bid was deemed by some as non-compliant.  (Defs.' Ex. HHH, ECF No. 222-12)  The bid submitted was a component bid, not a basket bid, thereby requiring multiple closings, and antitrust issues had been raised.  Additionally, although the Oldcastle bid had the support of the Committee, the Cement Resources bid was backed by the secured lenders, who were funding operations and wanted operations closed as soon as possible.  (Pl.'s Ex. 2, ECF 246-1)

protections for Cement Resources, including a sizeable break-up fee,[10] coverage of up to $750,000 in expenses, and re-setting dates at Cement Resources' insistence. (Order Auth. Sale at ¶ 7, Main Case ECF No. 455) When Cement Resources did not prevail at the auction, Plaintiff contends the estate was forced to bear the expense of these terms.

In spite of the Committee's misgivings about Defendants' motivations, following a hearing on the motion, the parties submitted an agreed order, stating "[t]he objections of the Committee of Unsecured Creditors and [other creditor] are resolved. (Ag. Order Approving Rev. Bidding Proc. ¶ 8, Main Case ECF No. 406)

What developed from Defendants' attempts to personally profit from the sale with side agreements was a pay-to-play environment, acknowledged Oldcastle, the eventual winning bidder and purchaser. Upon questioning of Oldcastle during the sale hearing, Mr. Rosenblatt, an attorney for Oldcastle, revealed that

> And we saw in the Atlas bid that they were negotiating to give employment agreements to management as well as an equity piece in the acquiring entity to Debtors' management. So we said okay. It looks like management is favoring that bid because they are doing that. We have no choice but to propose the same thing to management, at least, to equalize the playing field. So my client prepared some management agreement and a performance agreement and submitted it to the Schwabs … I don't believe they've responded to the agreement.

(Transcript of Hearing held 5/28/10 at 60:7-18, Main Case ECF No. 1118) Oldcastle met with Jerry, Donna and David individually and eventually offered an earn-out package valued in the neighborhood of $7 million. (Pl.'s Ex. 80, ECF No. 246-4; Pl.'s Ex. 100, ECF No. 246-5) Key terms included five year employment for David Schwab at $300,000 per year with a thirty percent (30%) bonus potential; Jerry and Donna Schwab maintaining director positions for five years with compensation of $150,000 per year; and an option to participate in "future performance of the business, via a one-time payment at the end of five years." (Id.)

Concerns about Defendants' self-dealing and self-interest were also specifically raised during the sale process. The Committee renewed its charges about self-dealing. Paragraph three of its objection calls the Cement Resources bid "suspect," stating "Debtors' insiders have a strong incentive to support the Cement Resources bid notwithstanding the fact that it may cause significant harm to unsecured creditors, and that their business judgment is hopelessly conflicted." (Obj. of Off. Comm. of Unsec. Creds. ¶ 3, Main Case ECF No. 434) The Committee called the sale a *sub rosa* plan and identified other issues in the sale. (Id. at ¶¶ 4-5)

At the start of the sale hearing, the court was informed that Debtors' board, consisting of Jerry, Donna, David and Mary Lynn, were two-to-one in favor of the Oldcastle bid. (Pl.'s Ex. 4,

---

10 Cement Resources received a $1.9million break-up fee. (Order Auth. Sale ¶ 20, Main Case ECF No. 455)

5

ECF No. 246-1) Jerry and Mary Lynn voted in favor of the bid, David voted against, and Donna abstained. Later in the hearing, however, the court learned that the board took another vote, resulting in a 2-2 tie when Donna voted against Oldcastle. (Pl.'s Ex. 5, ECF No. 246-1) It is not entirely clear why Donna changed her vote, but the draft meeting minutes prepared by Debtors' counsel indicate her vote changed after she took a telephone call from Ed Fletcher, partner with Atlas Holdings LLC. (Pl.'s Ex. 5, ECF 246-1; Pl.'s Ex. 32, ECF No 246-2) She later testified that she just felt uncomfortable after the first vote. (Dep. of Donna Schwab 295:10 – 297:15, ECF No. 212-1)

As a direct result of the above, the court specifically inquired about the "continuing involvement of any insider with respect to either the Oldcastle deal or the Cement Resources deal?" (Tr. From 5/28/10 hearing, 48:17-29, Main Case ECF No. 1118) Debtors' counsel advised the court that there had been discussions with both Oldcastle and Cement Resources for some continued involvement by one or more of the Schwabs. (Id. at 48:21 – 49:2) The court delved further into the issue and specifically questioned counsel for the unsecured creditors' committee ("Committee") whether there was any hint of bad faith that could affect the sale or sale process. Mr. Hammer, one of the attorneys for the Committee, specifically stated "[n]ot with respect to Oldcastle and [RLH]." (Id. at 53:4-5) He further stated

> We know that the Cement Resources transaction has an insider
> element to it. The extent of those insider elements have never
> been fully disclosed to us . . . still being worked out. But there
> is clearly a continuing role for management and insiders contem-
> plated under the transaction . . . I don't believe that the Oldcastle/
> Land Resource holding bid has – I don't believe they anticipate
> to retain management going forward . . . But you clearly have two
> different go-forward concepts here.

(Id. at 53:4 – 55:8)

In spite of advice from Debtors' counsel to disclose the details of any side agreements, full disclosure was not forthcoming. It is plainly obvious that at least Donna Schwab was unwilling to divulge information on the agreements with the other constituencies involved in the case. (Pl.'s Ex. 109 and 111, ECF No. 246-6)

Ultimately, the sale of Debtors' assets to Oldcastle was approved and an order entered on May 28, 2010. The sale order contained not only findings that the sale was made in good faith and that the purchase price was fair and reasonable, but also findings that dealt directly with Debtors' conduct during the sale process. Examples include:

> The Court is satisfied that no further marketing of the Assets is
> necessary and would not result in a higher or better bid being
> identified or negotiated, after considering, among other things,
> the interests of all stakeholders in these Assets, the time, costs

> and resources needed to continue any marketing process, the
> resources of Debtors and the morale of their employees.

(Order Auth. Sale ¶ 14, Main Case ECF No. 455)

> The Court is satisfied that Debtors' Marketing Process has
> identified and located the highest and best aggregate value
> for the Assets.

(Id.)

> The Purchase Price is fair and adequate consideration for the
> Assets, is the highest and best price for the Assets, and demon-
> strates an exercise of Debtors' reasoned business judgment.

(Id. at ¶ 16-17) Additionally, there were findings that the sale did not represent a *de facto* merger or *sub rosa* plan. (Id. at ¶ 19) Although the Committee objected to the sale, its objection was withdrawn. (Id. at ¶ 30, G)

The side agreements may have impacted the sale in a variety of ways. First, they could have decreased the amount of the stalking horse bid. There are suggestions in the record that Cement Resources was tapped out and the deal was too expensive. (Pl.'s Ex. 35, ECF 246-2; Pl.'s Ex. 36, ECF 246-2) Were it not for the side agreement, Cement Resources may have been able to pour more money toward the asset purchase rather than direct money toward the individual agreements, thereby providing a larger return to the estate. And the indications are Oldcastle's bid did not exceed its willing purchase price, leaving the firm impression money remained on the table. (Dayko Dep. 136:25-137:1, ECF No. 211-1) How the agreements may have impacted other interested parties is a great unknown. Other interested parties may have reacted in any number of ways, including withdrawal, if they came to the same conclusion as Mr. Rosenblatt of Oldcastle that the deal was rigged unless you paid the Schwabs.

## II. Res judicata

Defendants argue that Plaintiff's claim, which is based on self-dealing and self-interest, is barred by res judicata because Plaintiff twice raised related issues during the sale process and twice entered into agreed orders, thereby foreclosing this action. With res judicata, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." Montana v. U.S., 440 U.S. 147, 153 (1979). This serves to "promote the finality of judgments and thereby increase certainty, discourage multiple litigation, and conserve judicial resources." Heike v. Cent. Mich. Univ. Bd. of Tr., 573 Fed.App'x 476, 479 (6th Cir. 2014) (citing Westwood Chem. Co., Inc. v. Kulick, 656 F.2d 1224, 1227 (6th Cir. 1981)).

Four elements must be established for res judicata to apply: (1) a final decision on the merits by a court of competent jurisdiction, (2) a subsequent action between the same parties or

7

their privies, (3) an issue in the subsequent action which was litigated or should have been litigated in the prior action, and (4) an identity of the causes of action." Howe v. City of Akron, 2015 WL 5446917 (6th Cir. 2015) (reporter citation not yet available) (other citations omitted). As the proponents of the doctrine, Defendants bear the burden of proof. TolTest, Inc. v. N. Am. Specialty Ins. Co., 362 Fed.App'x 514, 516 (6th Cir. 2010) (unpublished) (citing Winget v. JP Morgan Chase Bank, 537 F.3d 565, 572 (6th Cir. 2008). Although the first two elements are not in dispute, and Plaintiff contends only the third and fourth element are not met, the court will discuss all four elements.

1. Finality

The parties do not dispute the first element. A sale order is a final order, thereby satisfying the first requirement for application of res judicata. Winget, 537 F.3d 565, 580.

2. Parties or their privies

Plaintiff does not challenge Defendants' statement that Defendants were parties or privies to the sale order. During the sale process, Plaintiff was acting as a financial advisor to Committee. He now occupies the role of Creditor Trustee of the Creditor Trust, the vehicle used for the benefit of the unsecured creditors. Consequently, his current role is the equivalent of the role previously occupied by the Debtor or Committee, both of which were parties to the sale order. There is no question that privity exists between the two, binding Plaintiff to the sale order.

In a similar but not identical vein, Debtors, not Defendants, were the actual parties to the sale order. Defendants, as shareholders and directors, were the decision-makers for Debtors and also were personally affected by the sale order. The relationship between the two warrants additional exploration.

In order to promote finality of a chapter 11 plan confirmation order, the Sixth Circuit was willing to view "party" expansively. Sanders Confectionery Prod., Inc. v. Heller Fin., Inc., 973 F.2d 474, 481 (6th Cir. 1992) (citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3rd Cir. 1988) cert. denied, 488 U.S. 967 (1988)). The court pointed out that in order to provide a fresh start to a debtor, it was necessary to understand that not only the debtor was bound by a confirmation order, but also parties on the periphery, including creditors and shareholders. Id.

Although this court is dealing with a sale order, not a confirmation order, similar principles are applicable. While the sale disposed of the bulk of Debtors' assets, it also effectively disposed of Defendants' equity interests and cemented the limited return to creditors. In order to protect the sale process and the purchaser, finality of the sale order is essential. Winget, 537 F.3d 565, 578, see also 11 U.S.C. § 363(m). The sale necessarily and conclusively disposed not only of Debtors' assets, and the principle business, but it also effectively disposed of the equity interests of the shareholders. Consequently, the court finds it is also necessary to

view "parties" to the sale order expansively.  Under this view, Defendants, as equity security holders, would meet the "expanded" definition of party, satisfying this factor of the res judicata analysis.

Defendants also claim that they were in privity with Debtors by virtue of their position as officers.  The court is not in complete agreement.  Defendants have cited the general rule but ignore that Sanders Confectionery suggests that a factual review must be undertaken in order to determine whether the interests are sufficiently aligned to create privity.  973 F.2d 474, 481-82.  If all facts are true, Defendants' efforts to personally gain from the sale could create a conflict of interest with Debtors to invalidate any privity between Defendants and Debtors.  However, since the court concluded that Defendants were parties, further discussion of privity is unnecessary.

### 3.  Actual or obligatory litigation

The parties disagree on the third element, whether the present claim was or should have been litigated during the course of the sale process.  When the two causes of action 'arose from the same transaction, or series of transactions . . . . [the latter action] should have been litigated in the earlier action.'  Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521 (6th Cir. 2006) (citation omitted).  This prong of res judicata aims to "compel litigants to bring all related claims in a single lawsuit."  Heike, 573 Fed.App'x at 481 (citing Wilkins v. Jakeway, 183 F.3d 528, 532 n.4 (6th Cir. 1999)).  According to the Sixth Circuit, the key focus is not whether the claim is compulsory, but "whether the claim should have been considered during the prior action."  Sanders Confectionery, 973 F.2d 474, 484.  The Fifth Circuit decision cited by the Sixth Circuit in Sanders also phrased the inquiry as whether the claim could have been "litigated effectively" in the prior suit.  Id. at 484 (citing In re Howe (Howe v. Vaughn), 913 F.2d 1138, 1146 (5th Cir. 1990)).

Most of the leading Sixth Circuit cases discussing res judicata and bankruptcy involve claims brought after the bankruptcy case in a different forum. Winget, 537 F.3d 565;  Browning v. Levy, 283 F.3d 761, 772 (6th Cir. 2002); Sanders Confectionery, 973 F.3d 474; Micro-Time Mgmt Sys., Inc. v. Allard & Fish, P.C. (In re Micro-Time Mgmt. Sys., Inc.), 983 F.2d 1067 (6th Cir. 1993).  In these situations, the Sixth Circuit suggests that the inquiry is two-fold, requiring a court to look at whether the claim could have been brought in the bankruptcy case and whether it should have been brought at that time.  Browning, 283 F.3d 761, 772; Winget, 537 F.3d 565, 579 (6th Cir. 2008).  Consideration of whether a claim could have been brought involves determining whether the bankruptcy court had subject matter jurisdiction over the claim.  Since the Sixth Circuit determined that res judicata may bar non-core, related claims as well as core claims, the inquiry often focuses on the outer reaches of bankruptcy jurisdiction, whether the claim is "related to" the bankruptcy case.  Sanders Confectionery, 973 F.3d 474.  The touchstones for whether a subsequent claim is "related" to the bankruptcy case is whether it would have an effect on the bankruptcy estate or impact the debtor's rights or liabilities.  Winget, 537 F.3d 565, 579 (citations omitted).

Procedurally, this case presents a varying fact pattern from the cases referenced above

9

because all the litigation has occurred in the same underlying bankruptcy case and no one challenges that the breach of fiduciary claim is not related.[11]  The court agrees that subject matter jurisdiction is not at issue.   Plaintiff alleges that shareholder/director actions during the sale process pulled money away from the estate and creditors, striking the appropriate touchstones.

The inquiry turns to whether this claim should have been brought during the sale process.  This consideration has received less attention by the Sixth Circuit than the former consideration.  The determination is not simple.   On one hand, it seems preposterous to argue that a breach of fiduciary duty claim should have been litigated against Defendants during the truncated sale process.   In this case, Debtors were still operating as a going concern, which is optimal for sale value.   However, the secured lenders were pushing for a quick sale by limiting funding for continued operations.   Additionally, Cement Resources, the stalking horse bidder, was also aggressively seeking a quick sale.   Under these time constraints, full litigation of a breach of fiduciary claim was nearly impossible while preserving the sale.

Plaintiff argues bringing the claim was impossible due to Defendants' affirmative concealment of the breadth of the negotiations with both Cement Resources and Oldcastle.  Under Browning, affirmative concealment may bar application of res judicata but mere silence will not suffice.   283 F.3d 770.    Instead, proof of something akin to fraudulent concealment is necessary.   Id.   The three elements of a fraudulent concealment claim are (1) wrongful concealment of action, (2) failure to discover the operative facts of the claim until after the statute of limitation runs, and (3) exercise of due diligence until discovery of the operative facts.  Carrier Corp. v. Oyj, 673 F.3d 430 (6th Cir. 2012) (citation omitted).    The court is not convinced that Plaintiff established affirmative concealment.

For the purposes of this argument, the court is going to operate on the assumption that Defendants did have a duty to disclose their negotiations and did not do so.   As a result, the question becomes whether Plaintiff, or his predecessor, had sufficient information or exercised reasonable diligence with the information available.   On this point, the court cannot find in Plaintiff's favor.

Defendants' negotiations with Cement Resources were clearly known by parties to the sale process.   The court will not restate all the facts outlined above in detail but will highlight key examples.   In an email dated April 30, 2015, an attorney for the Committee sent an email that stated "the Schwabs apparently are also negotiating the terms of a go-forward agreement for them with Atlas."   (Defs.' Ex. HHH, ECF No. 222-12)    Approximately one week later, Plaintiff sent an email acknowledging his awareness that Defendants were negotiating for management agreements and equity.   (Pl.'s Ex. 40, ECF No. 246-3)   The negotiations were also referenced in pleadings filed with the court and was part of the foundation for the Committee's objection to appointment of Cement Resources as the stalking horse bidder.   (M. Rev. Bidding Proc. Order, Main Case ECF Nos. 344 and 346; Obj. of Off. Comm. of Unsecured Creds., Main

---

[11]   The court does note that although Plaintiff alleged this is a core proceeding in paragraph thirteen of the amended complaint, Defendants denied this allegation.

Case ECF No. 378). The Committee objection was ultimately resolved. (Ag. Order Approving Rev. Bidding Proc. ¶ 8, Main Case ECF No. 406)

The Winget case is instructive at this point because Winget argued he did not have all the facts to bring the claim during the bankruptcy case. The Sixth Circuit rejected the argument, finding "the claims Winget brings in the Complaint are largely identical to the arguments Winget made in its objection to the Sale Order, which it later withdrew." Winget, 537 F.3d 565, 580. Clearly, the facts show that Plaintiff, and others, were aware of the nature of the negotiations between Defendants and Cement Resources with ample time to, at a minimum, maintain its objection or make further inquiry. Consequently, the court cannot find affirmative concealment with regard to the Cement Resources deal.

Although the side agreements with Oldcastle were not as open, several parties were aware of their existence. Most damning for Plaintiff is his own admission he knew, around May 21, 2010, that the Schwabs had been communicating with Oldcastle about side agreements:

> Q: And it states on page 2 of the letter that Old Castle (sic) had discussions with the Schwab family regarding their going-forward role with the business operations of Old Castle and has entered into discussions with certain members of the Schwab family about the possibility of retaining some or all of them after the closing of the sale. And then it continues that Oldcastle has had discussions regarding future consideration in exchange for value including vehicles and other physical assets owned by the Schwab family that are used in the debtors' business operations and non-compete agreements. And you read this on or around May 21, 2010, right?
>
> A: Yes.

(Depo. of John B. Pidcock, pp. ECF 207-1, pp. 109;21-110:10). His testimony indicates that he inquired about the specifics of the deal, which no one divulged:

> A: They wouldn't disclose any of the terms because nothing was agreed to. It's not atypical for in a transaction to have some transition agreements with current management. So it's not surprising that they would have these conversations. I would be surprised that they didn't have these conversations, however, what we didn't know was what the makeup of the agreements would be, what they would look like, typically it's salary, non-compete, that type of thing.

(Id. at 111:4-13) Not only does he admit that he was aware that Defendants were in discussions, he also indicated such discussions were not uncommon.

11

Other disclosures were also made. During the sale hearing, Oldcastle revealed that

> And we saw in the Atlas bid that they were negotiating to give employment agreements to management as well as an equity piece in the acquiring entity to Debtors' management. So we said okay. It looks like management is favoring that bid because they are doing that. We have no choice but to propose the same thing to management, at least, to equalize the playing field. So my client prepared some management agreement and a performance agreement and submitted it to the Schwabs … I don't believe they've responded to the agreement.

(Transcript of Hearing held 5/28/10 at 60:7-18, Main Case ECF No. 1118) An attorney for Debtors, Daniel DeMarco, also generally indicated, without citation to a specific event, the banks and Committee were made aware of the negotiations. (Depo. of Daniel A. DeMarco at 9:7 – 11:15, ECF No. 214-1)

The sum of the above leads the court to the inescapable conclusion that the negotiations with Oldcastle were not concealed. Although the specific terms were not known, there is no indication that anyone pressed the issue or made diligent efforts to ascertain the terms. The court cannot find that affirmative concealment bars application of res judicata, nor that concealment was a bar to bringing these claims earlier in this case.

Since affirmative concealment does not bar res judicata, the court returns to the question of whether Plaintiff should have brought these claims during the sale process. In discussing the finality prong of res judicata, the Sixth Circuit acknowledged that "with the execution of the sale order the debtor's assets are judicially sold and no further litigation can be brought regarding those assets without forcing the court to undo the sale, an action of the very kind res judicata seeks to prohibit." Winget, 537 F.3d 565, 579. This brings into focus the true nature of the sale order, the disposition of the assets. Since there is no intent here to alter the transfer of the assets under the sale order, and a monetary award might be sufficient to provide a partial remedy for any harm that resulted from the alleged breach of fiduciary duty, there is a strong argument against application of res judicata. Moreover, as previously acknowledged by this court and others, these types of considerations make a traditional res judicata analysis more difficult to apply in the bankruptcy context and may warrant use of a totality of the circumstances review for application of res judicata. Pidcock v. Goddard (In re SII Liquidation Co.), 2014 WL 5325930 (Bankr. N.D. Ohio 2014) (citing HSBC Bank USA, N.A. v. Adelphia Commc'ns Corp., 2009 WL 385474, *12 (W.D.N.Y.2009) (citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 n. 5 (3rd Cir.1988)).

While the above tends against application of res judicata, the problem for Plaintiff is that the Sixth Circuit takes finality of the sale order earnestly. When subsequent claims attempt to denigrate the sale order, the Sixth Circuit has not been favorable in its consideration of the later

12

claims. In Winget, the Sixth Circuit applied res judicata, finding

> Winget's claims attack the Defendants' pre-bankruptcy actions and allege that the Defendants deliberately devalued the assets of Deluxe prior to its bankruptcy proceeding and subsequent sale, those claims would have had a direct effect on the assets in the bankruptcy proceeding. For example, in the Complaint Winget asks for a declaratory judgment that would require the court to value Deluxe's assets at their pre-bankruptcy value. As those assets have largely been sold, a request for such an order could only have been brought prior to the sale of those assets.

Id. at 579. In this adversary, Plaintiff clearly suggests that the assets were sold below their value. This attack on the sale seems to be similar to the challenge rejected by the Sixth Circuit in Winget. The precedential impact of Winget cannot be overlooked. The entire premise of Plaintiff's complaint is that the assets sold for less than they would have but for Defendants' actions, an attempt repudiated by Winget. This exact issue is raised in this adversary, with Plaintiff alleging that but for Defendants' side agreements, the auction of Debtors' assets would have resulted in a higher sale price. This is precisely the issue that was at issue during the sale process, rendering this claim one that should have been brought at that time.

**4. Identity of the causes of action**

Regarding the final element, Plaintiff argues that this court's decision in a related adversary, Pidcock v. Goddard ("Goddard"), leads to a finding that there were separate transactions, thereby defeating res judicata. 2014 WL 5325930. The court disagrees, finding the Goddard decision easily distinguishable. First, Plaintiff overstates the holding. In Goddard, the Creditor Trustee is suing professionals employed by the estate to provide restructuring services for allegedly dividing their loyalties to the estate. The court found that the professionals were not parties to the sale order and did not have a sufficient legal interest in the sale order to be deemed privies. The court went on to reject the professionals' claims that they were protected by the "good faith" finding of the sale order, concluding that "good faith" for the purposes of § 363(m) is meant to protect the purchaser, not to "legitimize all actions of professionals in the case." Additionally, the court found that, at the time the fee applications and sale order were entered, it was not aware of potential claims against the professionals. For these reasons, the court declined to apply res judicata.

Here, Debtors and Defendants were directly and intimately involved in the sale process and were parties to the sale order. The claims now asserted by Plaintiff were raised two times during the sale process and withdrawn. Specific findings in the sale order negate the alleged harm now claimed. While the exact specifics of the side deals may not have been known, there was sufficient information to put the Committee and Plaintiff on notice and provoke additional inquiry. Failure to pursue full disclosure may have been a calculated, strategic decision to allow the assets to be sold while the business was operating and the fire was hot rather than risk any

13

devaluation a delay may have wrought. (Order Auth. Sale ¶ 21, Main Case ECF No. 21) Regardless, to the extent the present claim was not actually litigated during the sale process, the overlap in the findings supporting the sale order, including findings that the process generated the best price for the assets and the sale was fair and reasonable, and the allegations of this complaint suggesting Defendants' actions harmed the sale process, create an identity between the causes of action for res judicata purposes. The court finds the fourth element is satisfied.

This decision is not without moral unease. The court in no way seeks to condone the actions of Defendants. Plaintiff set forth a compelling argument that Defendants' focus was not on what was in Debtors' best interests and acted with little regard for the unsecured creditors and with great regard for themselves. However, the court does note that the unsecured creditors were represented during the sale process and signed the sale order. Their objections were either resolved or withdrawn.

This decision is not intended to be a green light for directors and/or shareholders to elevate their interests over those of a bankrupt corporation. However, on the facts of this case, where Defendants' actions were not fully concealed, and the court issued a sale order contravening the damages alleged by Plaintiff, the court is without authorization to revisit the sale order.

The application of res judicata to the sale process arose from concern that sales needed to be final. Buyers would not pay a fair price if they needed to be concerned with endless litigation about the merits or finality of the terms or the title to what was purchased. The easiest way to deal with this valid concern was to carry over the tried and true precedent of res judicata and apply it to sale orders.

The problem is that it is an uncomfortable fit. An ox cart is a means of transporting a load, but it is not a desirable means of transporting any load from Ohio to California. Similarly, res judicata is a means of protecting a sale order, but it creates undesirable effects in the process.

Application of res judicata grew from courts making logical argument by analogy. A bankruptcy sale order needs to be protected and is like other court orders, therefore it should be protected like other court orders applying res judicata. Things should be treated similarly because they are similar, but not identically because they are not the same. The analogy works to the extent things are similar but not to the extent they are different. Argument by analogy's inherent strength is its inherent weakness. Brothers have similarities. The three Alou brothers were all good enough to make it from the Dominican Republic to the major leagues, but only one could hit with power. It gets even tougher with Cain and Abel. Analogies are never perfect.

The problem is that res judicata precedent has, to this point in time, been driven like a truck through a vegetable stand in an action movie. There has been no recognition of the inherent *procedural* differences between bankruptcy sale orders and general civil litigation orders. Perhaps more importantly there has been nearly no recognition of the inherent *functional* differences between bankruptcy sale orders and general civil litigation orders.

14

The procedural differences are relatively obvious. Orders at the end of a trial occur following months or years of discovery and motions and then days or weeks of trial. In the Schwab Industries sale, the real guts of the legal process transacted in hours at the courthouse on one day. There was definitely a great deal of legal activity in the preceding months, but there had been little understanding about the scope of self-dealing and zero formal discovery. It appears that the revelation by Oldcastle's president that he felt the need to pay the Schwabs in order for Oldcastle's bid to be considered was made the first time *at the hearing*. There was no way this could be fully investigated, or investigated at all, as the participants passed a melting ice cube around the courtroom with the lender refusing to extend the operating life of Debtors.

The functional differences between a general civil litigation order and a bankruptcy sale order appear not only to be less obvious, but perhaps entirely misunderstood. The goal, or function, of the application of res judicata is normally set out as protecting the purchaser by protecting title via defending the integrity of the order. No one can doubt res judicata's effectiveness in protecting purchasers in the sale order context. It has done very well in this regard and bankruptcy sale orders are viewed as the gold standard for acquisition risk management.

The problem is that defending the purchaser is an intermediate goal and only one of several intermediate goals. The ultimate goal, which is to say the functional end of the sale process, is to maximize value. Put in Canton, Ohio terms: How do we get the most money?

Protecting purchasers' title is one way of getting the most money. Buyers will be willing to pay top dollar if they know that the path ahead is free of litigation and other questions. So the function of buyer protection is merely an intermediate goal of the ultimate goal: to get the most money.

Achieving the ultimate goal requires the courts to recognize that there are other intermediate goals in addition to buyer protection that must be considered. Another intermediate goal is honesty. There can be little doubt that honest and fair proceedings produce the most money for several reasons, not the least of which is that all are encouraged to participate, secure in the knowledge that the playing field is level. Second, additional funds may be added to the purchase price if not consumed by payoffs.

Holding those responsible for the cost of their dishonesty would not require disturbing the purchaser's title pursuant to the sale order. The sale need not be set aside and the purchaser need not be disturbed nor his warranties impacted. It would merely mean that those who participated in dishonest conduct could be sued for damages. Slavish devotion to res judicata, recognizing no exceptions or limitations, operates as an overcompensating shield for misbehaving owners by providing a "Get Out of Jail Free" card no matter their conduct.

One piece of evidence stands out as particularly damning and makes it clear that millions of dollars was paid as baksheesh just to get the Schwabs out of the way. As of February 12,

2014, the Schwabs stated that they had received the monies due and payable under their agreements with Oldcastle in spite of being "barred from the business properties formerly known as Schwab Industries, Inc. . . . [and] representatives of Oldcastle advised [them] that they were not authorized to enter onto any of the Ready Mix Concrete business operations . . . [and] since June 2010, Oldcastle has not identified 'any specific duties' for any one of the aforementioned Schwabs." (Pl.'s Ex. 100, pp. 22-23, ECF No. 246-5)

But the precedent is what it is. There are no broad exceptions, nor even many narrow ones, and the court is obligated to follow precedent. Bankruptcy judges are more like bus drivers than ship captains, who sit up top and make the rules. We sit up front and take orders.

A separate order granting Defendants' motions for summary judgment will be entered immediately.

#  #  #

**Service List:**

Julie L Juergens
Jamie A Price
Monica Sansalone
Gallagher Sharp
Bulkley Bldg, 6th Floor
Cleveland, OH 44115

Steven M Hartmann
Richard S Lauter
Shira Isenberg
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606